**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **DONALD HELLER,**<br>**Plaintiff,**<br>**v.**<br>**MICHAEL JAMES BERRY I, *et al.*,**<br>**Defendants.** | **Case No. 21–cv–20371–ESK–SAK**<br><br>**OPINION** |

**KIEL, U.S.D.J.**

In this action, plaintiff Donald Heller seeks unpaid compensation and damages for his alleged retaliatory discharge as chief operating officer (COO) of Optimal Acuity Corporation (Optimal). The parties dispute Heller's employment status and whether its directors and officers—defendants Michael James Berry I, Patricia Berry, and Edward Saenz—are liable for his unpaid compensation. They also dispute the reason for his termination. While Heller moves for summary judgment only on his failure-to-pay-wages claim (Motion) (ECF No. 90–1 (Pl.'s Mov. Br.)), defendants move for summary judgment in their favor on all claims (Cross-Motion)[1] (ECF No. 93–1 (Defs.' Mov. Br.)). Because genuine disputes of material fact remain, neither party is entitled to summary judgment.

## I. FACTUAL BACKGROUND

In 2013, Heller and Berry formed Optimal, a medical device company. (ECF No. 90–18 (Berry I Dep. A) pp. 3, 4.) At all relevant times, Heller served

[1] Although defendants do not identify their moving papers as a cross-motion, I will refer to them as such for ease of reference.

as chief executive officer (CEO) of Light Age, Inc. (LAI), and Berry I served as president of Antropix Corporation. (*Id.* p. 3; ECF No. 90–3 (Heller Dec.).)

On February 15, 2013, Optimal held its first board of directors (Board) meeting at LAI's facility. (ECF No. 90–4 (Feb. 2013 Meeting Mins.).) The Board, then consisting of only Berry I and Heller, adopted Optimal's bylaws. (*Id.*; ECF No. 90–19 (Bylaws).) Heller was elected treasurer, and Berry I was elected president and secretary. (Feb. 2013 Meeting Mins.) The Board agreed that Berry I would receive $200,000 annually as president and that Optimal's staff would be compensated through LAI or Antropix by serving as their consultants. (*Id.*) While compensation for other officers was not determined, the Board decided that "until additional funding is obtained, [Optimal's] staff members [would] receive deferred compensation and stock options … and … deferred expense reimbursements." (*Id.*)

Optimal primarily operated from LAI's facility, Heller's New Jersey home, or Berry I's Texas home. (Heller Dec. ¶¶ 17–22; Berry I Dep. A pp. 31, 32.) LAI's facility was used for investor meetings and device development, construction, and testing. (Heller Dec. ¶¶ 17–22; Berry I Dep. A pp. 31, 32.)

On October 21, 2015, the Board unanimously elected Berry I as CEO and Heller as COO. (ECF No. 90–6 (Oct. 2015 Written Consent).) The Board also agreed that it would "be in the best interest of Optimal and its stockholders to enter into … [a] [c]onsulting [a]greement by and between … [Optimal] and certain [a]ppointed [o]fficers." (*Id.*; ECF No. 90–23 (Consulting Agreement).) Such consulting agreements were to substantially match the consulting agreement Optimal entered with Antropix on October 21, 2015. (Consulting Agreement.)[2] The Board did not define "certain appointed officers," but Berry

[2] The October 21, 2015 consulting agreement was signed by Berry I on behalf of "Antropix/ Consultant" and Heller as Optimal's director. (Consulting Agreement.)

I testified that all officers and regular staff members were expected to enter into a consulting agreement. (ECF No. 93–11 (Berry I Dep. B) pp. 5, 7.)

On November 12, 2015, Berry I signed an agreement with Optimal to serve as CEO. (Berry I Dep. A pp. 27, 34, 35.) But Heller explains that he was never provided a consulting agreement because he "refused[] from the very beginning[] to be a consultant to [Optimal]." (ECF No. 100–2 (Pl.'s Opp'n Br. Exs.)[3] pp. 16, 17, 28, 29, 30, 31.) Defendants suggest that since Heller never signed an agreement to serve as COO, he did not accept the position. (ECF No. 104–2 (Defs.' Resp. to Pl.'s SUMF) ¶¶ 31, 32, 35, 36; Berry I Dep. A p. 59.) The parties nonetheless agree that Heller acted as COO, raising capital for Optimal, meeting with investors, and securing patent protections. (Heller Dec. ¶ 40; Berry I Dep. A p. 63; ECF No. 104–1 (Berry I Dec.) ¶ 14.)

Heller and Berry I were reelected to their positions in May 2016. (ECF No. 90–25 p. 2.) On March 28, 2017, the Board "approved compensation of $300,000 per annum for the services of CEO ([Berry I] – acting through a consulting agreement with Antropix …) and COO ([Heller] – acting through [LAI])." (ECF No. 90–22 (Mar. 2017 Meeting Mins.) p. 2.) In doing so, the Board "recognized that [Heller] became COO on [21] October 2015[4] and that his compensation be retroactive to that date." (*Id.*) Although Berry I advised Heller that his compensation would be deferred until Optimal had more money (Berry I Dep. A pp. 55–56; Heller Dec. ¶¶ 65–67), Heller alleges that he has received no portion of his COO salary to date. (Heller Dec. ¶¶ 65–67.)

---

[3] It is my general practice to label documents that appear multiple times within an opinion. In support of Heller's opposition to the Cross-Motion, Heller filed multiple exhibits at ECF No. 100–2. To avoid confusion, I will adopt this convention without further specifying the cited document.

[4] The March 2017 meeting minutes indicated in error that Heller became COO on October 12, 2015. The correct date is October 21, 2015. (*See* ECF No. 90–7.)

It is undisputed that Heller was to receive his salary payments "very indirectly" from Optimal through LAI. (ECF No. 100 (Pl.'s Resp. to Defs.' SUMF) ¶ 40; ECF No. 93–5 p. 2.) Defendants recognize that Heller deserved compensation and "had it been done in a way that was correct, he probably would have gotten some." (Berry I Dep. A pp. 59, 63, 65.) But the parties disagree whether absent a signed agreement between Optimal and Heller, Optimal "need[s] to pay anyone any money for the services Heller rendered as [COO]." (*Id.* p. 59.) To the extent Heller is entitled to compensation, defendants suggest that Heller should seek relief against LAI, not Optimal. (Defs.' Resp. to Pl.'s SUMF ¶ 82.) Meanwhile, Heller maintains that despite not having signed an agreement, the record establishes his appointment as COO and entitlement to deferred compensation. (*See generally* Heller Dec.)

Optimal had no payroll process. (Berry I Dep. A p. 45.) According to Heller, discussions were had for Optimal to send Heller's salary to LAI, so LAI could then remit the salary to Heller. (Heller Dec. ¶¶ 37, 38; Pls.' Opp'n Br. Exs. pp. 14–18.) Defendants deny such discussions. (Berry I Dec. ¶¶ 10–12.) Yet, they acknowledge that LAI billed Optimal for Heller's services, and that "Heller was supposed to bill [Optimal] for his time." (*Id.*; Defs.' Resp. to Pl.'s SUMF ¶ 82[5].) Although Heller never personally billed Optimal for his COO salary (Pl.'s Resp. to Defs.' SUMF ¶ 37), LAI sent Optimal invoices totaling $820,273.96 for Heller's "[c]ontract consulting services" from 2016 through 2018. (ECF No. 93–6 pp. 1–7[6]; ECF No. 93–8.) Between December 2017 and

---

[5] Defendants' response in paragraph 82 (Defs.' Resp. to Pl.'s SUMF ¶ 82) does not address the assertion in the corresponding paragraph of plaintiff's statement of material facts (*see* ECF No. 90–2 ¶ 82 ("Approximately 3.042 years elapsed between October 12, 2015 and October 27, 2018.")).

[6] Heller takes issue with this exhibit because "[d]efendants proffer no evidence as to who made page handwritten modifications to the invoices." (ECF No. 100 ¶ 16.)

December 2019, Optimal paid LAI $240,500. (ECF No. 93–12.) The record does not identify what these payments were for. (*See id.*) Although Heller maintains he personally received no compensation, defendants suggest Heller should have received money from the payment made to LAI. (ECF No. 90–2 ¶ 88; Defs.' Resp. to Pl.'s SUMF ¶ 88.)

On September 29, 2018, the majority of Optimal's shareholders approved Berry I's proposed resolution to remove Heller as COO, treasurer, and director. (ECF No. 90–26; ECF No. 90–27 (Proposed Resolution) p. 3; ECF No. 90–28.) The resolution cited Heller's disagreements with Berry I over Optimal's direction and his allegedly conflicting roles at Optimal and LAI.[7] (Proposed Resolution p. 3.) On October 27, 2018, the Board—consisting of Berry I, Michael James Berry II, and Paul Wiener—removed Heller from those positions. (ECF No. 90–29.) And on December 14, 2018, Berry I notified Heller that Optimal was canceling its medical device supply and purchasing agreement with LAI due to alleged regulatory non-compliance. (ECF No. 93–19.) The letter also claimed approximately $11 million in lost revenue. (*Id.*) But Heller maintains that he was terminated because he repeatedly demanded his compensation. (Heller Dec. ¶¶ 65, 66.)

Optimal's financial records list substantial deferred-compensation obligations. A March 5, 2019 conversion calculation lists $823,562 in deferred compensation for "D Heller" and $431,184 corresponding shares, marked "Tentative." (ECF No. 90–30 p. 3.) The balance sheets for 2017 through 2019 separately list amounts "Due to [LAI]" and, under the header "Liabilities to be converted into equity," amounts "Due to Antropix" and "Other Deferred Compensation." (ECF No. 90–31 p. 2.) Berry I testified that the "Due to

[7] When Berry I was asked whether a conflict existed between his roles at Optimal and Antropix, he explained: "The state, it is me." ( Pls.' Opp'n Br. Exs. p. 44.)

Antropix" entry reflected compensation for Berry I's services, while amounts due to LAI were recorded separately. (Berry I Dep. A pp.71–72.) Berry I believes compensation for Heller's services was included in that category, but it may also have included compensation owed to others. (*Id.* p.73.)

Two years after Heller's termination, Optimal appointed Wiener as COO. (Berry I Dep. A p.58.) By then, Optimal had raised at least one million dollars. (*Id.*) Wiener had signed an agreement with Optimal and was paid an unspecified amount for his role. (*Id.*) In March 2022, Saenz entered into a consulting agreement to serve as Optimal's COO and director for $10,000 per month, payable in cash, Optimal stock, stock options, or a combination thereof. (ECF No. 90–33 p.2.) The agreement allowed Optimal to pay Saenz in stock options until it received at least $1 million in investment proceeds after the agreement's execution. (*Id.*)

On September 1, 2022, the Board—then consisting of Berry I, Patricia Berry, and Edward Saenz—unanimously authorized Optimal to file for bankruptcy. (ECF No. 90–34.) On October 16, 2022, Optimal filed a voluntary Chapter 7 petition in the Bankruptcy Court for the Western District of Texas. (ECF No. 90–35 pp.2, 5–6.) Since the bankruptcy petition terminated Saenz's consulting agreement, Saenz filed an $86,000 proof of claim on January 2, 2023 for wages, salaries, or commissions earned as Optimal's COO. (*Id.* pp.3–4.)

## II. PROCEDURAL HISTORY

On November 4, 2021, Heller commenced this action in the Superior Court of New Jersey against Optimal, Berry I, and Berry II. (ECF No. 1. pp.8,9.) After removing this action on December 6, 2021 (*see id.* pp.1–3), Optimal, Berry I, and Berry II filed a motion to dismiss (Dismissal Motion) on December 10, 2021. (ECF No. 4.) On February 27, 2023, the Dismissal Motion was denied as to Berry I and Berry II and stayed as to Optimal pending its bankruptcy

petition. (ECF No. 19.) Heller then voluntarily dismissed his claims against Optimal and Berry II. (ECF Nos. 28, 33.)

With leave from the Court (ECF Nos. 38, 39), Heller filed on March 12, 2024 a second amended complaint. (ECF No. 40 (Second Am. Compl.).) The second amended complaint adds Patricia and Saenz as defendants and asserts claims for failure to pay wages (count one) and retaliatory discharge (count two). (*Id.*) Defendants then unsuccessfully (ECF Nos. 48, 61) moved to dismiss the second amended complaint (ECF No. 45) and to file counterclaims (ECF No. 57). After the parties completed discovery, the Court entered briefing schedules for the Motion and Cross-Motion. (*See* ECF No. 85.)

Heller filed the Motion on March 13, 2026 (Pl.'s Mov. Br.), and defendants filed the Cross-Motion on March 19, 2026 (Defs.' Mov. Br.).[8] Heller opposed the Cross-Motion on April 6, 2026. (ECF No. 99 (Pl.s' Opp'n Br.).) On April 10, 2026, defendants opposed the Motion. (ECF No. 101.) Because the submission was untimely, I struck it and directed defendants to explain why it should be accepted. (ECF No. 102.) On April 14, 2026, defendants submitted a letter addressing the issue (ECF No. 103) and refiled their opposition (ECF No. 104 (Defs.' Opp'n Br.).)[9] On the same day, defendants filed a reply in

[8] On March 10, 2026, defendants first moved for summary judgment. (ECF No. 87.) I administratively terminated the motion on March 12, 2026 because the papers did not comply with the Court's filing rules. (ECF No. 88.) Defendants refiled their motion on March 17, 2026, but I again directed them to correct the formatting of their brief. (ECF Nos. 91, 92.)

[9] Defendants' briefs in opposition to the Motion and in support of the Cross-Motion violate Local Civil Rule 56.1(a) and paragraph six of my Rules and Preferences, which provides that "parties may not incorporate by reference, in their briefs, their numbered statements of material facts … or responses thereto as a substitute for a statement of facts." By failing to provide a fact section in the briefs, defendants have increased the Court's burden rather than clarify the issues before it. *See Globespanvirata v. Texas Instrument*, No. 03–02854, 2005 WL 3077915, at *2 (D.N.J. Nov. 15, 2005).

further support of the Cross-Motion. (ECF No. 105.) Heller filed a reply in further support of the Motion on April 28, 2026. (ECF No. 108 (Pl.'s Reply Br.).)

## III. LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it will "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a "reasonable jury could return a verdict for the nonmoving party." *Id.* The movant "bears the burden of demonstrating the absence of any genuine issues of material fact." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996). The party may satisfy its burden by "produc[ing] evidence showing the absence of a genuine issue of material fact" or "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant makes this showing, the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmovant must "point to concrete evidence in the record that supports each and every essential element of his case." *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995).

The Court's role is not to weigh the evidence and decide the truth, but to determine if there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In making that decision, "[a]ll facts and inferences are construed in the light most favorable to the non-moving party," and credibility determinations are for the fact finder. *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## IV. DISCUSSION

### A. Count One: Failure to Pay Wages

Under count one, Heller alleges that defendants violated "the New Jersey Wage Payment Law [(WPL)], the New Jersey Wage and Hour Law [(WHL)], and the Fair Labor Standards Act ([FLSA)], and other state and federal laws." (Second Am. Compl. ¶21.) Unlike the WPL which governs an employer's obligation to pay wages earned by an employee, the WHL and FLSA establish minimum wage and overtime requirements. *See Stebbins v. Petroleum Equip. Servs.*, No. 21–15117, 2022 WL 717166, at *3, 7, 9 (D.N.J. Mar. 9, 2022).

Heller asserts that he is entitled to summary judgment on count one because the record establishes that he was Optimal's employee and authorized to receive an annual salary. (Pl.'s Mov. Br. pp. 18–37.) Meanwhile, defendants argue that because Heller never executed an agreement with Optimal to serve as COO, he never accepted the proposed compensation arrangement. (Defs.' Mov. Br. pp. 7–10.) They also contend that LAI was responsible for paying Heller, and that Patricia and Saenz did not become directors until after his termination. (*Id.* pp. 4–10; Defs.' Opp'n Br. pp. 1–9.)

#### 1. The WPL[10]

The WPL "'governs the time and mode of payment of wages due to employees,' and is a remedial statute to be construed liberally." *Bosco v. Compass Grp. USA, Inc.*, No. 22–06909, 2025 WL 1742657 (D.N.J. June 23,

[10] The Motion does not specify whether plaintiff is seeking summary judgment for all three statutes asserted in count one. (*See generally* Pl.'s Mov. Br.) Considering Heller's analysis is limited to the ABC test, which applies to the WPL, my analysis of the Motion does not discuss the WHL and FLSA. But I make reference to those statutes when addressing the Cross-Motion.

2025) (quoting *Maia v. IEW Constr. Grp.*, 313 A.3d 887, 895 (N.J. 2024)). It "is designed to protect an employee's wages and to assure timely and predictable payment." *Id.* (quoting *Hargrove v. Sleepy's, LLC*, 106 A.3d 449, 463 (N.J. 2015). Thus, relief pursuant to the WPL requires a showing that the plaintiff was an "employee" and that the compensation at issue constituted "wages" within the meaning of the statute. *See id.* "If an employer violates the statute, the []WPL permits an employee to sue to recover the 'full amount of … wages.'" *Id.* (quoting N.J. Stat. Ann. § 34:11-4.7).

A determination as to whether a plaintiff is an employee under the WPL "command[s] the application of the unyielding, statutory ABC test." *Tomasello v. ICF Tech., Inc.*, No. 23–03759, 2026 WL 1500841, at *12 (D.N.J. May 28, 2026); *see Hargrove*, 106 A.3d at 453. "New Jersey law presumes that workers are employees and places the burden on putative employers to show otherwise by satisfying all three elements of the ABC test: (A) the 'control' test; (B) the 'course of business' or 'place of business' test; and (C) the 'independent business' test." *Portillo v. Nat'l Freight, Inc.*, 606 F. Supp. 3d 72, 90 (D.N.J. 2022). "Because this test is conjunctive, an employer's failure to satisfy even a single prong is dispositive, establishing statutory employee status as a matter of law." *Tomasello*, 2026 WL 1500841, at *13.

"Wages" is defined by the WPL as the "direct monetary compensation for labor or services rendered by an employee, where the amount is determined on a time, task, piece, or commission basis excluding any form of supplementary incentives and bonuses which are calculated independently of regular wages and paid in addition thereto." *Stebbins*, 2022 WL 717166, at *9 (quoting N.J. Stat. Ann. § 34:11–4.1).

Heller contends that Optimal controlled his work and that his COO duties were central to its business. (Pl.'s Mov. Br. pp. 25–30.) He also maintains that he worked at Optimal's places of business and did not operate an

independent business providing COO services. (*Id.* pp. 28–34.) Meanwhile, defendants argue that Heller was neither an employee nor an independent contractor. (Defs.' Mov. Br. pp. 4–9; Defs.' Opp'n Br. pp. 4–8; ECF No. 90–39 p. 3.) Rather than meaningfully address the ABC Test, defendants suggest that Heller's entitlement to compensation was never triggered because Heller never signed a consulting agreement. (Defs.' Mov. Br. p. 12; Defs.' Opp'n Br. pp. 5–11.) Yet, had it been triggered, LAI—not Optimal—is responsible for Heller's compensation. (Defs.' Mov. Br. pp. 5–10; Defs.' Opp'n Br. pp. 5–11

I agree with Heller that defendants cannot satisfy their burden of the ABC test. *See Morales v. V.M. Trucking, LLC*, No. A–2898–16T4, 2019 WL 2932649, at *6 (N.J. Super. Ct. App. Div. July 9, 2019). Optimal elected him COO, and his duties fell within its usual course of business. (Heller Dec. ¶ 40; Berry I Dep. A p. 63; Berry I Dec. ¶ 14.) He also performed work at the locations where Optimal conducted its business. (Heller Dec. ¶¶ 17–22; Berry I Dep. A pp. 31, 32.) Since defendants cannot meet prong B, I need not decide whether factual disputes under prong A or prong C exist. *See Hargrove*, 106 A.3d at 458.

But that conclusion does not establish whether the compensation Heller seeks became payable. (*See* Defs.' Mov. Br. p. 12; Defs.' Opp'n Br. pp. 5–11.) Heller is correct that the WPL does not require a signed employment or consulting agreement. *See Winslow v. Corporate Express, Inc.*, 364 N.J. Super. 128, 137–39 (App. Div. 2003).[11] In other words, the absence of a writing does not, by itself, defeat Heller's wage claim. *Id.* Thus, the relevant question is whether the approved compensation became payable despite the absence of the

---

[11] Since a written agreement is not necessary to be eligible for relief under the WPL, I find defendants' arguments concerning the statute of frauds to be irrelevant. (*See* Defs.' Mov. Br. p. 11; Defs.' Opp'n Br. p. 5.)

further agreement defendants say was required. (*See* Defs.' Mov. Br. p. 12; Defs.' Opp'n Br. pp. 5–11.)

The record supports competing accounts. At the October 2015 Board meeting Heller was elected COO, and the Board separately approved a form of consulting agreement for "certain appointed officers." (Oct. 2015 Written Consent p. 2.) The record does not define that term, leaving unclear whether Heller was included within that category. (*Id.*) But the March 2017 meeting minutes approved annual compensation of $300,000 and made that compensation retroactive to Heller's appointment. (Mar. 2017 Meeting Mins. p. 2.) Heller testified that Berry I knew he would not serve as a consultant or sign a consulting agreement. (Pls.' Opp'n Br. Exs. pp. 17–18, 29.) A jury could infer from this evidence that the Board approved Heller's compensation despite the absence of an agreement.

Defendants give a different account. They contend that since all officers and regular staff members had to sign consulting agreements, Heller's refusal to do so meant he never accepted the COO offer. (Berry I Dep. B pp. 5, 7.) They also note that compensation was withheld due to the absence of a valid contract. (Berry I Dep. A p. 65.) To the extent defendants attempt to evade liability by arguing Optimal undertook no personal obligation to Heller (*see* Pl.'s Resp. to Defs.' SUMF ¶ 40; Heller Dec. ¶¶ 37, 38), it is unclear whether, absent an agreement, Heller can be considered as having earned his compensation.

Since the weighing of evidence is required and that task belongs to the jury, summary judgment on the WPL aspect of count one will be denied.[12]

---

[12] Defendants also oppose the Motion under the statute of limitations. (Defs.' Opp'n Br. p. 12.) While the parties dispute the length of the statute of limitations, this issue was not raised as an affirmative defense. (*Id.*; Pl.s' Reply Br. pp.17, 18.) Thus, defendants have waived the opportunity to raise this argument at this stage. *Harrison Beverage Co. v. Dribeck Importers, Inc.*, 133 F.R.D. 463, 469 (D.N.J. 1990).

**2. <u>The FLSA and WHL</u>**

"The FLSA establishes federal minimum-wage, maximum-hour, and overtime guarantees that cannot be modified by contract." *Abarca v. KC Consulting Grp., Inc.*, No. 16–00213, 2018 WL 2215516, at *4 (D.N.J. May 14, 2018) (quoting *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014)). "Under the FLSA, employers must pay their employees at least a specified minimum hourly wage for work performed … and must pay one and a one-half times the employer's 'regular rate' of pay for each hour worked in excess of 40 hours a week." *Id.* "Employers who violate these provisions are 'liable to the employee or employees affected in the amount of their unpaid minimum wages, or the unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.'" *Id.* (quoting 29 U.S.C. § 216(b)). "The NJWHL mirrors its federal counterpart." *Id.* "Indeed, the []WHL requires employers to pay their employees at least the federal minimum hourly wage rate set by the FLSA." *Id.* "A plaintiff, however, cannot recover under both the FLSA and []WHL, since recovery under the []WHL would duplicate recovery under the FLSA." *Id.*

In the Cross-Motion, defendants reference in passing that the FLSA and WHL do not apply to Heller because he "did not accept the offer to be the COO, and therefore, … never signed an employment agreement or a consulting agreement [and] … did not work for [Optimal] as an employee." (Defs.' Mov. Br. p. 12.) Whether an employment relationship existed under the FLSA and WHL is a fact-intensive inquiry that depends on "the economic realities of the situation." *Echavarria v. Williams Sonoma, Inc.*, No. 15–06441, 2016 WL 1047225, at *3 (D.N.J. Mar. 16, 2016). "Under the economic realities test,

courts must examine the totality of the circumstances to determine whether the economic realities of the situation indicate that an employment relationship existed." *Id.* "Relevant factors include: (1) who hired and fired the workers, (2) who controlled and supervised the workers, (3) who determined the workers' salaries, and (4) who maintained the workers' employment records." *Id.* "New Jersey courts have examined a range of other factors including who furnished the workers' equipment, whether the workers received benefits, and the intention of the parties." *Id.* Although defendants' argument rests heavily on the statute of frauds (Defs.' Mov. Br. p. 12), the economic realities test does not require that there be a written employment agreement. *See Echavarria*, 2016 WL 1047225, at *3. This inquiry requires a weighing of the evidence. *Id.* Accordingly, summary judgment on the FLSA and WHL aspect of count one will also be denied.

**3. <u>Individual Liability</u>**

Patricia and Saenz also seek dismissal because they became directors after Heller's termination from Optimal. (Defs.' Mov. Br. pp. 13, 14.) They rely on the voting and concurrence requirements of the New Jersey Business Corporation Act (BCA), which Heller argues is inapplicable here. (*Id.*; Pl.s' Opp'n Br. pp. 29–31.) Heller asserts that after joining the Board, Patricia and Saenz inherited the responsibility to have Optimal pay the compensation allegedly owed to him. (*Id.*) Because he has received no compensation to date, Heller argues that Patricia and Saenz are liable to him. (*Id.*)

"Employer," as defined by the WPL, "include[s] any director of a corporation, even one who does not actively manage the corporation." *Martelet v. AVAX Techs., Inc.*, No. 09–02925, 2012 WL 1570964, at *8 (E.D. Pa. May 3, 2012). In other words, "*all directors are responsible for managing the business and affairs of the corporation.*" *Mulford v. Comput. Leasing, Inc.*, 759 A.2d 887, 893 (N.J. Super. Ct. Law Div. 1999) (emphasis in original). "A director

cannot protect himself from performance of his legally imposed duties behind a paper shield bearing the motto 'dummy director.'" *Id.* "Directors may owe a duty to employees, as far as payment of their owed compensation is concerned." Since inactivity or the lack of involvement in a particular decision does not necessarily shield a director from liability, this argument is rejected.

### B. Count Two: Retaliatory Discharge

Heller alleges that defendants terminated him because he complained that Optimal failed to pay the compensation he was owed. (Second Am. Compl. ¶ 26.) Defendants seek summary judgment, arguing that Heller made no informal complaint about unpaid wages and was instead removed because of performance and business concerns. (Defs.' Mov. Br. p. 9.) Heller responds that he repeatedly demanded his salary before he was terminated and that defendants have not established that his termination was unrelated to those demands. (Pl.'s Opp'n Br. pp. 21–23; Heller Dec. ¶¶ 65, 66.)

Claims of retaliation under the FLSA and WHL are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Cohen v. BH Media Grp., Inc.*, 419 F. Supp. 3d 831, 850 (D.N.J. 2019). To establish a *prima facie* case, a plaintiff must show that he engaged in protected activity, suffered an adverse employment action, and that the adverse action was causally related to the protected activity. *Id.* An oral complaint may constitute protected activity if it is sufficiently clear and detailed to put a reasonable employer on notice that the employee is asserting rights protected by the FLSA. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011). Once the plaintiff satisfies his initial burden, the employer must articulate a legitimate, nonretaliatory reason for the adverse action. *See Cohen*, 419 F. Supp. 3d at 854, 857. The burden then returns to the plaintiff to point to evidence from which a reasonable factfinder could disbelieve the

employer's stated reason or conclude that retaliation was more likely than not a motivating or determinative cause of the decision. *Id.*

The parties' competing explanations create a genuine dispute concerning the reason for Heller's termination. Resolving that dispute would require the Court to weigh the evidence and determine whether Heller was discharged because he complained about unpaid compensation or for the performance and business reasons defendants identify. That determination belongs to the jury. Accordingly, summary judgment as to count two will be denied.

## V. CONCLUSION

For the reasons stated above, the Motion and Cross-Motion are **DENIED**.

*/s/ Edward S. Kiel*
**EDWARD S. KIEL**
**UNITED STATES DISTRICT JUDGE**

Dated: October 31, 2026